Peter Goldstein [SBN 6992]
PETER GOLDSTEIN LAW CORP
Peter@petergoldsteinlaw.com
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone:    (702) 474-6400
Facsimile:     (888) 400-8799

Andrew J. Kopke [PHV]
Kopke Christiana & Rastetter LLP
199 Cook Street, Suite 308
Brooklyn, NY 11206
Telephone:    (917) 451-9525

*Attorneys for Plaintiffs*
*MAUREEN GREENSTONE, individually, and*
*as Appointed Guardian of SETH DALE*
*GREENSTONE, an Adult Protected Person*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA (LAS VEGAS)

| | |
|---|---|
| MAUREEN GREENSTONE, individually, and as Appointed Guardian of SETH DALE GREENSTONE, an Adult Protected Person,<br><br>Plaintiffs,<br><br>vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT; VIDAL CONTRERAS; DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-00290-GMN-NJK<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES** |

**(1) Excessive Force**
(42 U.S.C. § 1983; Nev. Const. art. 1, sec. 18)

**(2) Deprivation of Familial Association**
(42 U.S.C. § 1983; Nev. Const. art. 1, § 8)

**(3) *Monell* Liability**
(42 U.S.C. § 1983)

**(4) Disability Discrimination**
(42 U.S.C. § 12131 *et seq.*; 29 U.S.C. § 794(a))

**(5) Battery**

**(6) Negligence**

Exhibit "A" Order Appointing Guardian

**DEMAND FOR JURY TRIAL**

1

Plaintiffs allege upon information, belief, and personal knowledge:

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

1.  Seth Dale Greenstone ("Seth") is a Navajo man in his mid-thirties. Seth is also an individual with a disability that is protected under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. More specifically, Seth suffers from schizophrenia and major depression, among other mental impairments. These mental impairments substantially limit Seth's major life activities, including, but not limited to, his ability to communicate and interact with others, cope with the stress of a police encounter, and engage in basic self-care.

2.  Maureen Greenstone is Seth's mother and Appointed Guardian. See Exhibit A.

3.  In March of 2021, Seth was 31 and living with his family in Clark County Nevada.

4.  Shortly before noon on March 1, 2021, Seth was experiencing a severe schizophrenic episode. His auditory hallucinations had driven him to suicidal despair, and he found himself standing in an empty desert lot, holding a box cutter and cutting his neck.

5.  In a plea for help, Seth called 911 to report that a man was bleeding and holding a knife at his location near Lamb Boulevard and Cecile Avenue in North Las Vegas ("the scene").

6.  In response, the dispatcher set up a Suicide Attempt call in the CAD system ("the call").

7.  The dispatcher broadcast that the call required a Supervisor Armed Tactic Response (STAR) Protocol.[1]

---

[1]    Per Defendant LVMPD's written policies, a call requires a STAR Protocol when the nature of the call suggests that the subject may be armed and dangerous. When the call-taker receives such a call, the dispatcher should assign at least one patrol Sergeant and at least three other officers. The Sergeant should arrive at the scene with, or before, the other officers and should then coordinate and supervise the other officers with the goal of containing the subject, slowing the momentum, deescalating, and using the lowest level of force necessary to gain control of the situation.

As the Critical Incident Review Team (CIRT) explained in their post-incident report, "STAR Protocol states [that] patrol supervisors will be responsible for tactics and supervision of the incident. Patrol supervisors will make the determination for the use of a shotgun, rifle, arrest team, less lethal option, or other tools/resources (*i.e.*, shield, Air Unit, K-9, and SWAT). Supervisors are expected to de-escalate situations through communication of their expectations."

8. The dispatcher assigned Sergeant Jared Stanton and Officer Kyle Nuskin to the call.

9. Defendant Vidal Contreras ("Contreras") assigned himself to the call. He then abandoned the call he was on at the time, activated his emergency lights, and began emergency response driving (Code 3) toward the scene. As he drove, Contreras reached excessive speeds. He also engaged in several dangerous maneuvers including driving against traffic at a high rate of speed while yelling and cursing at other drivers.

10. Meanwhile, Sergeant Stanton broadcast that he was assigned to the call and confirmed that the call required a STAR Protocol.

11. A second patrol supervisor, Sergeant Lam, also assigned himself to the call, along with Detective Ludtke.

12. Despite knowing that the call required a STAR Protocol, and that this required a coordinated response, Contreras ensured that he would arrive at the scene before the other assigned officers. Contreras did this by driving Code 3 and at excessive speeds in violation of LVMPD policies. Then, as he approached the scene and saw the other assigned officers, Contreras deactivated his emergency lights. Rather than stopping or waiting for the other officers, Contreras crept past their patrol vehicle and made his way to the scene alone.

13. When asked by CIRT and other investigators why he sought to be the first to arrive at the scene and why he did not wait for, or coordinate with, the other officers in order to set up containment, cover, and distance, Contreras offered a series of contradictory explanations. At times, Contreras insisted that he did not know where the other officers were. And at other times, he claimed that he was concerned Seth would enter a business.[2]

---

LVMPD's Subject Matter Experts (SMEs) agree that "best practice is for supervisors to direct and control the incident over the radio to ensure a subject is located and contained at a distance."

[2] In their report, CIRT made clear that they found these explanations entirely implausible. Contreras arrived at the scene approximately 20 seconds after he crept past the other officers, and there were no businesses in the vicinity.

14. When he arrived at the scene, Contreras parked his vehicle approximately 25 to 30 yards away from Seth.

15. Contreras then exited his vehicle, drew his gun, and used an optic with red dot sight and laser to aim the gun at Seth's head.

16. Contreras intentionally aimed for Seth's head even though Seth's entire body was visible, and officers are trained to aim for the center mass.[3]

17. Contreras then began advancing on Seth, ordering him to drop the knife.

18. When Seth did not instantly comply with these orders but continued walking, Contreras fired his gun once, striking Seth in the head and piercing his left frontal lobe.

19. As Seth recoiled from the first shot, Contreras again fired his gun at Seth's head and missed.

20. At no point did Contreras warn Seth that lethal force would be used if Seth did not drop the knife.

21. From the time Contreras exited his vehicle to the time he fired the first shot, approximately six seconds elapsed.

22. Approximately three seconds after Contreras exited his vehicle, Officer Nuskin arrived at the scene and retrieved a low lethal shotgun.

---

[3]     As CIRT explained, "Officer Contreras fired two consecutive rounds from a standing position using a two-handed firing grip. **He used the red dot optic on his firearm to aim for Greenstone's head** and struck him at least once in the head. **Prior to firing shots, Greenstone's entire body was presented to Officer Contreras** as he walked toward him with a knife."

Indeed, Contreras freely admitted to CIRT and the SMEs that he intended to shoot Seth in the head. In his CIRT interview Contreras stated, "so the first thing that I, uh, came into—my red dot sight, was his head—as as I was adjusting my, uh, red dot was his head. And that's when I still saw him advancing with my other eye opened with the knife in his hand, towards me." Later in the interview, Contreras elaborated, "as I realized that he still was not listening to my verbal commands, is when I raised my weapon up, I looked for my—my red dot. I got my red, my—I, uh, acquired the picture of my red dot, which was on his head, with my other eye open, I still see that he was advancing me—with with me—towards me with a weapon. And then that's when I took the shot."

23. According to measurements taken by the Force Investigation Team (FIT), at the time Contreras fired the first shot, Seth was at least 12 feet, six inches away, well outside striking distance.

24. At the time of the shooting, Seth was suicidal and standing in an empty desert lot holding a box cutter with a tiny razor-like blade.

25. Contreras, meanwhile, was wearing body armor and carrying a $3000 Staccato handgun with an optic and laser.

26. At the time of the shooting, Seth had not committed a crime, and there was neither probable cause nor reasonable suspicion to believe that he had done so.

27. Moreover, Seth did not pose an immediate threat to Contreras or anyone else.

28. At the conclusion of their investigation, CIRT made the following findings:

 a. Contreras violated numerous policies as he drove and responded to the scene;

 b. Contreras did not communicate or attempt to coordinate his response with other officers;

 c. Contreras did not "slow the momentum" or "gather resources";

 d. Contreras failed to use the cover and concealment that were available to him;

 e. Contreras failed to create distance between himself and Seth;

 f. Contreras rapidly closed the distance between himself and Seth;

 g. Contreras failed to use the low lethal force options that were available to him;

 h. Contreras intentionally shot Seth in the head, as opposed to his center mass; and

 i. Contreras's threat assessment was not reasonable.

29. As a result of the CIRT and FIT investigations, as well as reviews by the SMEs, Tactical Review Board, and Use of Force Board, Defendant LVMPD decided to fire Contreras for egregious violations of several of LVMPD's written policies, including their policies governing the use of force.

30. LVMPD categorized Contreras's misconduct as Category G. An officer commits Category G misconduct when his "act or omission [is] of such an egregious nature that

the employee is rendered ineffective in his position and/or the act or omission would tend to bring the Department into public discredit."

31. In explaining LVMPD's decision to terminate Contreras, Assistant Sheriff Andrew Walsh stated that Contreras was "completely ineffective on this call in that it was about someone who was not actively harming anyone and was suicidal."

32. Assistant Sheriff Walsh also noted that he was disturbed by Contreras's insistence that Seth caused the shooting and by Contreras's repeated contradictory statements to investigators. For example, Walsh emphasized that "when asked whether you could have physically relocated after exiting your vehicle, you explained that you could not due to unknown traffic behind you. Despite this, after you shot SG in the head, you immediately relocated behind your patrol vehicle."

33. In short, LVMPD decided to fire Contreras because his misconduct was egregious, his threat assessment was not reasonable, and he displayed a shocking degree of dishonesty during the post-shooting investigations.

34. As a result of Contreras's misconduct and constitutional violations, Seth has been permanently incapacitated. He has suffered a severe traumatic brain injury, left hemiplegia, gait impairment, right side visual impairment, expressive aphasia, oropharyngeal dysphagia, and functional debility, among other conditions.

35. Seth's life expectancy has been reduced by approximately 19 years, and he will spend many, if not all, of those years in and out of hospitals and assisted living facilities.

36. For the rest of his life, Seth will require near constant medical and psychological care, as well as hearing aids, physical therapy, speech therapy, occupational therapy and 24 hour attendant care.

37. Seth's mother, Maureen Greenstone, now brings this action to vindicate her son's constitutional rights and to seek redress in the form of compensatory and punitive damages, as well as attorneys' fees.

//

//

## JURISDICTION AND VENUE

38. This civil action is brought pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act of 1973, and the constitution and laws of the State of Nevada. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1367, as this action seeks redress for violations of Plaintiffs' federal constitutional rights, federal statutory rights, and pendant state law claims.

39. Venue is proper in the United States District Court for the District of Nevada (Las Vegas) pursuant to 28 U.S.C. § 1391(b), because the defendants are located in and do business in Clark County, Nevada, and the incidents and events giving rise to Plaintiffs' claims occurred in Clark County, Nevada.

## PARTIES

40. Seth Dale Greenstone is a man in his mid-thirties. He resides in Clark County, Nevada.

41. Maureen Greenstone is Seth's mother. She also resides in Clark County, Nevada. She sues in her individual capacity and in her capacity as Seth's Appointed Guardian.

42. Defendant Las Vegas Metropolitan Police Department ("LVMPD") is a political entity and the law enforcement agency for Clark County and the City of Las Vegas, duly organized and existing under the laws of the State of Nevada.

43. LVMPD, by and through its officials and supervisors at its central offices and facilities, promulgates, implements, and executes policies relating to the conduct of its officers, including Contreras and Does 1-5.

44. LVMPD's officials and supervisors are aware of and tolerate practices by subordinate employees such as Contreras and Does 1-5, including those that are inconsistent with formal policies. These practices, because they are widespread, long-standing, and deeply embedded in the culture of LVMPD's divisions, constitute unwritten LVMPD policies or customs.

45. LVMPD is also responsible for the training, supervision, discipline, and conduct of all its officers, including Contreras and Does 1-5. LVMPD is therefore liable to Plaintiffs under a theory of *respondeat superior* for all those claims where such vicarious relief is available.

46. At all relevant times, Defendant Vidal Contreras was an employee and officer of LVMPD. Contreras is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an official, employee, and agent of LVMPD.

47. At all relevant times, Defendants Does 1-5 were employees and officers of LVMPD. Does 1-5 are sued in their individual capacities for acts committed under color of state law and within the scope of their duties and authorities as officials, employees, and agents of LVMPD.[4]

48. At all relevant times, Defendants Does 6-10 were employees and supervising/policymaking officials of LVMPD. Does 6-10 are sued in their individual and official capacities for acts committed under color of state law and within the scope of their duties and authorities as officials, employees, and agents of LVMPD.[5]

//
//
//
//
//
//
//
//

---

[4]     As of the date of this action's filing, Plaintiffs are ignorant of the true names of these Defendants and, accordingly, these Defendants are fictitiously named as Does 1-5.

[5]     As of the date of this action's filing, Plaintiffs are ignorant of the true names of these Defendants and, accordingly, these Defendants are fictitiously named as Does 6-10.

**CLAIMS FOR RELIEF**

**FIRST CLAIM—EXCESSIVE FORCE**

**(42 U.S.C. § 1983; Nev. Cons. art. 1, § 18)**

**Appointed Guardian against Contreras**

49. Plaintiffs repeat and reallege every allegation contained in the above paragraphs and further allege as follows:

50. The Fourth Amendment to the United States Constitution and Article 1, section 18 of the Nevada Constitution prohibits unreasonable searches and seizures by law enforcement officers and require the degree of force used by an officer to be objectively reasonable under the circumstances. Whether an officer's particular use of force was reasonable is judged from the perspective of a reasonable officer at the scene.

51.  To determine the perspective of a reasonable officer at the scene, a factfinder must consider the totality of the circumstances, including, but not limited to, the nature of the crime or other circumstances known to the officer, whether the plaintiff posed an immediate threat to the officer or others, the relationship between the need to use force and the amount or degree of force used, whether the officer made efforts to limit the amount of force used, and the availability of alternative methods that the officer could have used to accomplish legitimate law enforcement objectives.

52. In this case, Seth had not committed a crime because it is not a crime to be schizophrenic and suicidal. Nor is it a crime to carry a box cutter.

53.  Contreras knew that Seth was experiencing a mental health crisis and that he was suicidal because these facts were broadcast as part of the call and because Contreras typically responded to several Suicide Attempt/405z calls per week.

54. Contreras also knew that Seth was carrying a sharp-edged weapon because this fact was broadcast.

55. When Contreras arrived at the scene, he could see that Seth was standing alone in an empty desert lot.

56. Contreras knew that the other assigned officers were nearby, and he had multiple opportunities to coordinate with them to set up containment, cover, and distance.

57. But Contreras chose not to do so because, as he has admitted, he does not believe STAR Protocol is effective and was committed to being the first to make contact with Seth.

58. Contreras made no effort to deploy any of the myriad alternatives to deadly force that were available to him.

59. Contreras clearly had the opportunity to use cover and concealment, to create distance, to wait for backup, and to use low lethal force options. But instead, Contreras made an intentional decision to rapidly advance toward Seth and use the maximum amount of force that was available to him.

60. Contreras's use of force was therefore objectively unreasonable under the circumstances.

61. As a result of Contreras's acts and omissions, Seth has suffered excruciating pain and has been permanently incapacitated.

62. The extreme, outrageous, and malicious nature of Contreras's misconduct warrants the imposition of both compensatory and punitive damages.

63. Plaintiffs also seek attorneys' fees and costs.

### SECOND CLAIM—DEPRIVATION OF FAMILIAL ASSOCIATION

#### (42 U.S.C. § 1983; Nev. Cons. art. 1, § 8)

#### Plaintiffs against Contreras

64. Plaintiffs repeat and reallege every allegation contained in the above paragraphs and further allege as follows:

65. Parents and children have fundamental liberty interests in companionship and association with one another. These interests are secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 1, section 8 of the Nevada Constitution.

//

//

66. An officer can be held liable for depriving a parent or child of companionship and association when the officer's unconstitutional conduct causes such a deprivation and is sufficiently egregious to shock the conscience.

67. An officer's unconstitutional conduct shocks the conscience when it was deliberate or undertaken with a purpose to harm unrelated to a legitimate law enforcement objective. *See*, *e.g.*, *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008). An officer's conduct is undertaken with such a purpose when the conduct reveals "the intent to inflict force beyond that which is required by a legitimate law enforcement object . . . . " *Id.* An officer's conduct may reveal such intent where there is evidence to suggest that the officer "shot [the victim] for any other purpose than their (possibly mistaken) perception of the need for self-defense." *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022).

68. Contreras's conduct shocks the conscience because it was undertaken with a purpose to harm unrelated to legitimate law enforcement objectives.

69. Contreras's conduct reveals that he intended to inflict force beyond that which was required by a legitimate law enforcement objective.

70. More specifically, Contreras intentionally aimed for Seth's head even though Seth's entire body was visible, and officers are trained to aim for the center mass.

71. Contreras's decision to shoot Seth in the head was not based on his "(possibly mistaken) perception of the need for self-defense" because head shots are not trained and are not effective for that purpose.

72. As CIRT stated, "head shots are acceptable in certain situations and trained by LVMPD; however, these situations are not common and are typically centered around the suspect having body armor or when the head is the only target presented."

73. In all other situations, LVMPD officers are trained to shoot "center mass," i.e., at the suspect's body. This is true even when the officer perceives the need for lethal force. LVMPD Policy 6/002.02 provides: "Officers should shoot at the center mass for maximum stopping effectiveness and minimal danger to bystanders."

74. CIRT further stated, "Officer Contreras had conflicting statements about his assessment of target isolation when he intentionally did not select center body mass as it was readily available and would have provided maximum stopping effectiveness while minimizing danger to bystanders. Therefore, [Contreras] was not within standardized LVMPD tactics, training[,] and policy."

75. While Contreras's decision to shoot Seth in the head is sufficient in and of itself to show that he acted with a purpose to harm, it is by no means the only evidence of his illicit intent.

76. Nearly every action Contreras took during the response to the Suicide Attempt call amounted to a violation of LVMPD policy and/or the criminal law. This is not the conduct of an officer who is motivated by legitimate law enforcement objectives.

77. As a result of Contreras's constitutional violations, both Seth and Maureen have been permanently deprived of companionship and association with one another. Plaintiffs have also suffered severe mental and emotional anguish and have been permanently deprived of the benefit of Seth's future earnings.

78. The extreme, outrageous, and malicious nature of Contreras's conduct warrants the imposition of both compensatory and punitive damages.

79. Plaintiffs also seek attorneys' fees and costs.

//
//
//
//
//
//
//
//
//

## THIRD CLAIM—*MONELL* LIABILITY

## (42 U.S.C. § 1983)

## Plaintiffs against LVMPD

80. Plaintiffs repeat and reallege every allegation contained in the above paragraphs and further allege as follows:

81. At all relevant times, LVMPD, through their officials and agents, including Does 6-10, maintained constitutionally inadequate policies, customs, and procedures with respect to the use of force against individuals who are experiencing a mental health crisis and/or are suicidal.

82. LVMPD did not—and does not—adequately train its officers, including Contreras and the other officers involved in the response to the Suicide Attempt call, to respond to situations involving such individuals.

83. More specifically, LVMPD fails to adequately train its officers to coordinate and de-escalate such situations.

84. While Contreras's conduct was uniquely egregious, none of the officers involved in the response followed written LVMPD policies.

85. For example, the Sergeants failed to request resources or use the radio to coordinate with other officers. They made little to no effort to supervise their subordinates and delayed arriving at the scene. The Sergeants also failed to plan, direct, or control the tactics and force that were deployed in the response.

86. In explanation for the Sergeants' failure to follow policy and control the response, LVMPD's SMEs explained that they "believe[] there is not a clear expectation in policy or training to hold sergeants accountable for not requesting and assembling resources or communicating intent prior to arriving and locating a suicidal subject."

87. It is therefore clear that LVMPD fails to adequately train its officers to coordinate and de-escalate situations involving individuals who are experiencing a mental health crisis and/or are suicidal. This includes a failure to train its officers to:

13

    a.   Communicate about their response;

    b.   Slow the momentum and gather resources, including specialized assistance from officers with adequate training to respond to a mental health crisis;

    c.   Use cover and concealment;

    d.   Create distance;

    e.   Recognize the difference between subjects that pose an imminent threat to officers or others and those who are simply experiencing a personal crisis;

    f.   Contain the subject;

    g.   Not force a confrontation with the subject;

    h.   Respect the subject's comfort zone;

    i.   Engage in non-threatening communications;

    j.   Give proper warnings before using force;

    k.   Use the lowest level of force necessary to ensure the safety of the officers, the subject, and others.

88. As a result of this inadequate training, LVMPD officers are ill-equipped to respond to such situations and are likely to respond in a reckless manner that increases the risk of a lethal or near-lethal confrontation.

89. Moreover, LVMPD fails to adequately supervise and discipline its officers when they violate LVMPD's written policies. For example, in this case, LVMPD did not discipline the Sergeants, notwithstanding the fact that they were found to have violated several formal policies. Indeed, the decision not to discipline the Sergeants was based in part on the belief that it would be unfair to issue discipline in the absence of clear training and clear communication regarding LVMPD's expectations.

90. According to the most recent statistics publicly available, 32%, or approximately one-third, of LVMPD's officer-involved shootings were directed at individuals whom the officers perceived to be suicidal or experiencing a mental health crisis. By contrast, only

11% of LVMPD's officer-involved shootings were directed at individuals whom the officers perceived were not experiencing such a crisis.

91. Put slightly differently, according to LVMPD's own self-reported statistics, individuals who are experiencing a mental health crisis and/or are suicidal are approximately three times more likely to be shot by LVMPD officers than the average member of the public.

92. If these statistics were not enough, Plaintiffs can point to numerous specific instances of LVMPD officers using excessive, often deadly, force against such individuals. These instances include, but are not limited to:

    a. The shooting death of Lloyd Napouk, who was killed while suffering from a mental health crisis and holding a plastic toy sword.

    b. The shooting death of Anthony Brenes, who was killed on his way home from the Mojave Mental Health Clinic and was holding a wooden cane.

    c. The asphyxiation of Roy Scott, who was killed after calling 911 for assistance with his mental health crisis.

    d. The shooting of Sommer Richards, who was shot while experiencing a mental health crisis and holding a shovel.

93. LVMPDs constitutionally inadequate policies, customs, and procedures with respect to the use of force against individuals who are experiencing a mental health crisis and/or are suicidal caused Contreras to act with deliberate indifference to the rights of such individuals, including Seth.

94. LVMPD and Does 6-10 were and are aware that there is a recurring problem of their officers using excessive force against such individuals, who do not pose an immediate threat to the officers or others.

95. LVMPD and Does 6-10 were and are also aware that this problem could be avoided or remedied by adequately training, implementing, and requiring the use of well-known and widely accepted police tactics and techniques for responding to such situations.

96. LVMPD and Does 6-10 were aware that their unconstitutional policies would result in the type of constitutional violations and injuries described in this complaint. Despite this fact, LVMPD and Does 6-10 made the deliberately indifferent choice to maintain their unconstitutional policies. Thus, LVMPD and Does 6-10 knew of and consciously disregarded a known and obvious consequence of their policies, resulting in the constitutional violations and injuries described herein.

97. As a result of these acts and omissions, LVMPD and Does 6-10 are liable to Plaintiffs for compensatory damages.

98. Plaintiffs also seek attorney's fees and costs.

**FOURTH CLAIM—DISABILITY DISCRIMINATION**

**(42 U.S.C. § 12131 et seq.; 29 U.S.C. § 794(a))**

**Appointed Guardian against LVMPD and Does 6-10**

99.    Plaintiffs repeat and reallege every allegation contained in the above paragraphs and further allege as follows:

100.    Title II of the ADA and § 504 of the Rehabilitation Act prohibit public entities that receive federal funds from discriminating against individuals with disabilities in the provision of the entity's services, programs, or activities.

101.    A public entity may be held liable under Title II and § 504 when the entity's employee-officers discriminate against an individual with a disability in the course of conducting an investigation or seizure.

102.    An officer discriminates against an individual with a disability in the course of conducting an investigation or seizure when the officer fails to reasonably accommodate the individual's disability, thereby causing the individual to suffer greater injury or indignity than individuals without a disability.

103.    A public entity may be held liable for an employee-officer's discrimination when the officer either seizes an individual with a disability because he has a disability, or when the officer fails to take an individual's disability into account and fails to use tactics

that would have been likely to resolve the situation without injury to the officer or the individual.

104.     An individual may recover monetary damages under Title II and § 504 when he can prove that the officer's discrimination was intentional or deliberately indifferent. In other words, an individual must prove that the officer had knowledge that harm to a federally protected right was substantially likely and that the officer then failed to act upon that likelihood. An individual must also prove that the officer's failure to act was not merely negligent but contained an element of deliberateness.

105.     LVMPD is a public entity that receives federal funds to provide reasonable accommodations to individuals with disabilities.

106.     Seth was and is an individual with a disability because he suffers from schizophrenia and major depression, among other mental impairments.

107.     In March of 2021, Contreras was an employee-officer of LVMPD.

108.     In his capacity as an employee-officer, Contreras intentionally discriminated against Seth in the manner of his response to the Suicide Attempt call.

109.     Based on the nature of the call, Contreras knew that Seth was experiencing a mental health crisis and was suicidal. Contreras knew from his training and experience that the subjects of Suicide Attempt calls usually suffer from mental impairments.

110.     Contreras knew that the Suicide Attempt call required a STAR Protocol, which is specifically designed for responding to incidents involving individuals in mental distress.

111.     Indeed, the STAR Protocol and other LVMPD written policies incorporate the following reasonable accommodations:

    a.  Slowing the momentum and gathering resources, including specialized assistance from officers with adequate training to respond to a mental health crisis;

    b.  Containing the subject and creating distance;

    c.  Not forcing confrontation with the subject;

      d.  Respecting the subject's comfort zone, engaging in non-threatening communications, and de-escalating the situation.

112.    Despite knowing that Seth was experiencing a mental health crisis and knowing that the call required a STAR Protocol, Contreras made the intentional decision not to execute the Protocol.

113.    Instead, Contreras responded to the call in the manner described in the preceding sections.

114.    The manner of Contreras's response all but assured that the situation would escalate.

115.    When the situation did in fact escalate, Contreras's used excessive and lethal force against Seth.

116.    In so doing, Contreras made the intentional decision not to accommodate Seth's disabilities and discriminated against him based on the same.

117.    LVMPD is therefore liable to Plaintiffs for compensatory damages under Title II of the ADA and § 504 of the Rehabilitation Act.

118.    Plaintiffs also seek attorneys' fees and costs.

**FIFTH CLAIM—BATTERY**

**Plaintiffs against all Defendants**

119.    Plaintiffs repeat and reallege every allegation contained in the above paragraphs and further allege as follows:

120.    Common law battery consists of nothing more than an intentional and offensive or harmful touching of a person who has not consented to the touching.

121.    Defendant Contreras and Does 1-5, while working as officers for LVMPD, and within the scope of their duties and authorities, used unreasonable and unjustifiable force against Seth when they shot him in the head. Seth did not consent to being shot in the head.

//

122. As a result of Defendants' conduct, Plaintiffs have suffered excruciating physical pain, mental and emotional anguish, and lost earning capacity.

123. Defendant LVMPD is vicariously liable for the tortious conduct of Contreras and Does 1-5 because the conduct occurred in the scope and course of their employment as LVMPD officers.

124. Because the conduct of Contreras and Does 1-5 was extreme, outrageous, and malicious, Plaintiffs are entitled to both compensatory and punitive damages.

125. Plaintiffs also seek attorneys' fees and costs.

### SIXTH CLAIM—NEGLIGENCE

### Plaintiffs against All Defendants

126. Plaintiffs repeat and reallege every allegation contained in the above paragraphs and further allege as follows:

127. The acts and omissions of the Defendants were both negligent and reckless.

128. Defendants' negligent and reckless acts and omissions include, but are not limited to:

    a. Failing to properly and adequately plan the response to Seth's suicide call;

    b. Failing to communicate or coordinate the response;

    c. Failing to create the space and time that were necessary to effect a nonviolent self-surrender;

    d. Failing to use proper police tactics, including slowing the momentum, gathering resources, making use of cover and concealment, implementing suicide protocols, and making use of non-lethal force options;

    e. Advancing on Seth with a gun pointed at Seth's head;

    f. Not allowing Seth time to comply with commands;

    g. Not providing warning of the impending use of deadly force;

    h. Forcing the situation;

    i. Firing two shots at Seth's head;

1           j.    Failing to provide prompt medical care to Seth;

2           k.    Failing to adequately train, supervise, and discipline officers;

3           l.    Failing to implement LVMPDs formal policies and procedures.

4    129.      Plaintiffs' injuries are the direct and proximate result of these acts and omissions.

5    130.      Defendant LVMPD is vicariously liable for the tortious conduct of Contreras and

6    Does 1-5, because the conduct occurred in the scope and course of their employment as

7    LVMPD officers.

8    131.      Because the conduct of Contreras and Does 1-5 was extreme, outrageous, and

9    malicious, Plaintiffs are entitled to both compensatory and punitive damages.

10    132.      Plaintiffs also seek attorneys' fees and costs.

11
### DEMAND FOR JURY TRIAL

12    Plaintiffs hereby demand a trial by jury.

13

14 DATED this 21st day of February, 2024.

15                  PETER GOLDSTEIN LAW CORP

16

17                  */s/ Peter Goldstein*
                      Peter Goldstein [SBN 6992]

18

19                  Kopke Christiana & Rastetter LLP

20

21                  */s/ Andrew Kopke*
                      Andrew J. Kopke [PHV]

22                  *Attorneys for Plaintiffs*
                  *MAUREEN GREENSTONE, individually, and*

23                  *as Appointed Guardian of SETH DALE*
                  *GREENSTONE, an Adult Protected Person*

24

25

26

27

28

Exhibit A

Electronically Filed
06/08/2021 8:23 PM

*[signature]*

CLERK OF THE COURT

1    ORDR

2

3

4                              **DISTRICT COURT**
5                         **CLARK COUNTY, NEVADA**

6    In the Matter of the Guardianship of the:    G-21-054778-A
7    ☐ Person                                      Department F
     ☐ Estate
8    ☒ Person & Estate
9    ☒ Summary Administration
     of:
10   Seth Dale Greenstone,
11                          A Protected Person.

12              **ORDER APPOINTING GUARDIAN(S) OVER ADULT**

13          This matter came before the Court for hearing on June 08, 2021. Petitioner

14   Maureen Greenstone was present representing himself/herself.

15          Petitioner N/A was representing himself/herself.

16          Proposed Protected Person Seth Dale Greenstone, ☐ Was Present ☒ Was Not

     Present and is represented by counsel, Casey V Lee.  Presence waived
17
            It appearing to the satisfaction of the Court that notice is sufficient; and
18
            It appearing by clear and convincing evidence that it is necessary to appoint a
19
     guardian for the proposed protected person;
20
     **IT IS HEREBY ORDERED AND DETERMINED BY THE COURT** as follows:
21
        1.  Seth Dale Greenstone, date of birth 02/17/1990, is a resident of the State of
22          Nevada.
23      2.  The proposed protected person is an adult who needs the appointment of a
            guardian. This request is supported by recent documentation demonstrating the
24          need for a guardianship.
25      3.  Notice has been served upon the adult, the spouse and/or any living relative, or
            the public guardian, if necessary, and/or any other persons or agency having the
26          care, custody and control of the adult.
27      4.  It is necessary and in the best interest of the protected person that petitioner(s)
            be appointed as guardian(s). The following is/are appointed to act as
28          guardian(s) of the

            ☐ Person ☐ Estate ☒ Person and Estate ☒ Summary Administration

            and shall have the power and authority as may be necessary for the benefit of
            the above named Protected Person until further order of this Court:

Statistically closed: USJR Guardianship - Set/Withd With Jud Conf/Hr (UGSW)

Denise L Gentile
DISTRICT JUDGE
FAMILY DIVISION
Department F
LAS VEGAS, NV 89101-2408

a.  First Guardian: Maureen Greenstone
   Street Address: 6435 Grass Meadow Drive #132
   City, State, Zip: Las Vegas, NV 89142
   Telephone: _____

b.  Second Guardian: N/A _____ OR ☐ N/A
   Street Address: _____
   City, State, Zip: _____
   Telephone: _____

5. The Guardian(s) shall participate in the guardianship training class, if offered, through _____ OR ☐ N/A

6. Pursuant to NRS 159.081, the Guardian(s) shall file a written report on the condition of the Protected Person every year between the anniversary date of June 08, 2021 and August 07, 2021 for the first report and each year thereafter. This obligation continues until the guardianship of the person ends OR ☐ N/A

7. Bond is:
   ☐ Not applicable
   ☐ Reserved pending the filing of the inventory
   ☐ Ordered in the amount of $_____.
   ☑ Waived
   ☐ A blocked account is ordered in lieu of bond

8. Inventory:
   ☐ This is a person only guardianship; no estate is involved
   ☑ The Guardian(s) shall file an inventory of all of the property of the Protected Person which comes to the possession, or knowledge of the Guardian(s) by (date) August 7, 2021 _____.

9. Accounting:
   ☐ This is a person only guardianship; no estate is involved
   ☒ Summary administration of the estate is granted. An annual accounting is not required until assets exceed the statutory threshold for summary administration
   ☐ A verified account of the estate of the Protected Person shall be made and filed annually by_____, and must be filed within 60 days of this date and each year thereafter. This obligation continues until the guardianship of the estate ends.

10. Pursuant to NRS 159.0593:
    ☒ There is clear and convincing evidence that the Protected Person is a person with a mental defect who is prohibited from possessing a firearm pursuant to 18 U.S.C. §922 (d)(4) or (g) or (4). A Record of the Order containing this filing shall be transmitted to the central repository for Nevada Records of Criminal History, along with a statement that the record is being transmitted for inclusion in each appropriate database of the National Instant

Denise L Gentile
DISTRICT JUDGE
FAMILY DIVISION
Department F
LAS VEGAS, NV 89101-2408

Criminal Background Track System.

☐ The Protected Person's right to possess a firearm is not affected.

11.    Pursuant to NRS 159.0594:

☒ The Protected Person lacks the requisite understanding to vote or otherwise participate in the election process and shall be removed from the voting records.

☐ The Protected Person's right to vote is not affected.

12.    All powers are reserved to the Protected Person except for the following powers, which are granted to the Guardian(s):

**Powers over Person**

(*Court to check applicable powers granted to Guardian(s)*)

☒ To oversee, maintain and/or approve the placement of the Protected Person in the appropriate, least restrictive, and financially feasible care facility.

☒ Only in the event that provisions of NRS Chapter 433A DO NOT apply, to approve placement of the Protected Person in a secured facility, with the assistance law enforcement and/or REMSA if needed.

☒ To hire or discharge care givers as deemed necessary in the discretion of the Guardian.

☒ To authorize any medical care the Protected Person may require.

☒ To change the mailing address of the Protected Person.

☒ To make informed decisions regarding the Protected Person's health care, to include consultations on treatment plans, consents and admissions, consents for residential placements, consents for medications, and treatments recommended by medical providers, and the authority to make related decisions for the benefit of the Protected Person.

☒ The Guardian(s) is/are the Protected Person's personal representative for purposes of the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, and any applicable regulations. The Guardian(s) of the person has/have authority to obtain information from any government agency, medical provider, business, creditor or third party who may have information pertaining to the Protected Person's health care or health insurance.

☒ To ensure that housing and care arrangements provide the Protected Person with an appropriate level of safety, well-being, health and maintenance.

☒ To ensure that the Protected Person has access to family members and persons of natural affection, and those persons and family members have access to the Protected Person in a manner that ensures an appropriate level of safety and well-being for the Protected Person.

☒ To obtain neuropsychological examination to determine areas of defects and capacities.

☐ Other: _____

Denise L Gentile
DISTRICT JUDGE
FAMILY DIVISION
Department F
LAS VEGAS, NV 89101-2408

Page 3 of 5 – Order Appointing Guardian(s) (Adult)

**Powers over Estate**

*(Court to check applicable powers granted to Guardian(s))*

☑ Permission to sell, donate, distribute, dispose of and/or abandon personal property to maintain the integrity of the Protected Person's estate.

☑ Permission to freeze, access, utilize funds from, transfer and/or close any and all of the Protected Person's bank accounts and any and all other accounts at any financial institution, whether solely or jointly held, for the benefit of the Protected Person.

☑ Permission to redirect and/or become the representative payee for Social Security income, and similar income, if any, for the benefit of the Protected Person.

☑ Permission to obtain credit reports from any credit-reporting bureau to ascertain the status of any credit card accounts and/or lines of credit and activity on any such accounts.

☑ Permission to obtain tax information, tax returns and/or any necessary documents from the Internal Revenue Service for the benefit of the Protected Person.

☑ Permission to investigate, apply for and/or consent to services for which the Protected Person may be eligible.

☑ Permission to access, drill, open, inventory, remove the contents of, and/or close any safe deposit box, whether solely or jointly held by the Protected Person.

☐ Other: _____

13. Pursuant to NRS 159.074, a copy of this order must be served personally or by mail upon the Protected Person no later than 5 days after the date of the appointment of the Guardian. A notice of entry of the order must be filed with the Court.

14. The relatives required to be served and identified by petitioner as having been served pursuant to NRS 159.047(2) et seq. must be served with notice of this order pursuant to NRS 159.055(2)(d)(1) and are named in the Petition for Appointment of General Guardian and/or the Amended Petition for Appointment of General Guardian.

15. A notice of entry of order must be provided to the relatives identified above pursuant to NRS 159.055(3)(a).

16. The interested persons/entities required to be served and identified by the Petitioners as having been served pursuant to NRS 159.047(2) et seq. must be served with notice of this order pursuant to NRS 159.055(2)(d)(2).

17. A notice of entry of the order must be provided to the interested persons/entities identified above pursuant to NRS 159.055(3)(b).

Denise L Gentile
DISTRICT JUDGE
FAMILY DIVISION
Department F
LAS VEGAS, NV 89101-2408

Page 4 of 5 – Order Appointing Guardian(s) (Adult)

18. Guardian(s) must file verified acknowledgements of the duties and responsibilities of a guardian pursuant to NRS 159.073(1)(c).

19. Guardian(s) must immediately have the Letters of Guardianship and Oath issued. The Letters of Guardianship may be revoked for failure to file the annual reports pursuant to NRS Chapter 159.

20. Other:

_____

_____

_____

_____

_____

Pursuant to the Nevada Revised Statutes, the following information is provided:

Protected Person's Attorney: Legal Aid Center of Southern Nevada
Street Address: 725 E. Charleston Blvd.
City, State, Zip: Las Vegas, Nevada 89104
Telephone: (702) 386-1070

**IT IS SO ORDERED.**

Dated this 8th day of June, 2021

_____

**6E9 D70 C411 B307**
**Denise L Gentile**
**District Court Judge**

Denise L Gentile
DISTRICT JUDGE
FAMILY DIVISION
Department F
LAS VEGAS, NV 89101-2408

Page 5 of 5 – Order Appointing Guardian(s) (Adult)

**CSERV**

DISTRICT COURT
CLARK COUNTY, NEVADA

| | |
|---|---|
| In the Matter of the Guardianship of:<br><br>Seth Greenstone, Protected Person(s) | CASE NO: G-21-054778-A<br><br>DEPT. NO.  Department F |

## <u>AUTOMATED CERTIFICATE OF SERVICE</u>

This automated certificate of service was generated by the Eighth Judicial District Court. The foregoing Order Appointing General Guardian - Person & Estate -Summary was served via the court's electronic eFile system to all recipients registered for e-Service on the above entitled case as listed below:

Service Date: 6/8/2021

| | |
|---|---|
| Rosie Najera | rnajera@lacsn.org |
| Hope Samworth | hope@nevadalegalforms.com |
| Casey Lee | clee@lacsn.org |